# Transcript of the Testimony of
# Richard V. Baratta, PH.D., P.E.

**Date taken: September 6, 2016**

**Esaw Wright, et al v. Selective Insurance, et al**

All electronic deposition & exhibit files
are available at <<<www.psrdocs.com>>>.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.
Phone:504-529-5255
Fax:504-529-5257
Email:reporters@psrdocs.com
Internet: http://www.psrdocs.com

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 5

1    A.    Understood.
2    Q.    All right.  And I know you've been deposed a number
3  of times.  So, I'm going to skip all the preliminary stuff.
4  Are your educational and work history the same as identified
5  in your CV?
6    A.    They are.
7    Q.    All right.  In the last few years you haven't
8  gotten any new employment or in any way changed your
9  relationship with BRC?
10   A.    I don't have a relationship with BRC.
11   Q.    With Rimkus.
12   A.    Correct, with Rimkus.
13   Q.    With Rimkus.  I'm sorry.
14   A.    I'm still with Rimkus.
15   Q.    Okay.  And how long have you been with Rimkus?
16   A.    11 years and nine months now.
17   Q.    Are you a medical doctor?
18   A.    No.
19   Q.    Do you have any formal medical training?
20   A.    I'm not intended to become a medical doctor.  I did
21  take physiology in medical school.
22   Q.    Okay.  Other than that class, any other medical
23  training?
24   A.    No, sir.
25   Q.    Okay.  Dr. Baratta, what percentage of your work is

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 7

1  few percent, but not meaningfully.
2      Q.   Okay.  I see you have testified for plaintiffs in a
3  number of cases as I go through your prior testimony.  Is
4  that accurate?
5      A.   Yes.
6      Q.   All right.  And when you put a "P" in the column
7  marked "P/D/S" at the top, you place a "P" in that column
8  there indicating you were retained by the plaintiff in that
9  matter?
10     A.   Yes, sir.
11     Q.   Okay.  Have you ever testified on behalf of
12 plaintiffs in an accident similar to the one that is the
13 subject of this litigation?
14     A.   No, sir.
15     Q.   To your knowledge, have your opinions been excluded
16 by any court in which you intended to offer an opinion?
17     A.   Yes, sir.
18     Q.   All right.  In what courts have your opinions been
19 excluded?
20     A.   I'm aware of one time in the Western District of
21 Louisiana.  I'm aware of once in Galveston County.  And there
22 is maybe two times in Harris County, Texas.
23     Q.   Okay.  A little different variation of that
24 question.  Have your opinions ever been limited that you're
25 aware of?

Page 8

1   A.   Yes, sir.

2   Q.   Okay. Can you tell me in which cases your opinions
3   have been limited?

4   A.   I don't know specifically; but it does happen
5   fairly often that when my opinions are thought to fall into
6   the medical realm, then generally the judges will say that I
7   cannot provide medical opinions, which I'm okay with.

8   Q.   Okay. And in the case you and I had together, your
9   testimony was limited in the sense that Judge Miller
10  indicated you were not going to be allowed to give anything
11  that she considered to be a medical opinion in that case, the
12  Natalie Lockett case; is that correct?

13  A.   Correct, yes, sir, correct, that is correct.

14  Q.   Okay. And that also has been true with another
15  judge here in New Orleans in the Ariel Jones case that you're
16  aware of, same type of holding by a judge here?

17  A.   Ariel Jones was a different issue. But there was
18  another case in New Orleans -- I don't recall which --
19  where -- I may be getting my cases confused. But it has
20  happened, particularly in Orleans Parish, where there's been
21  indications that opinions that can be considered medical in
22  nature are not allowed.

23  Q.   All right. Have you ever been limited for reasons
24  other than a judge felt like your testimony was getting into
25  medical causation testimony and limited you from giving

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com


1  medical opinions? Have you been limited for any other
2  reasons?
3      A.   Not that I'm aware of. I mean, there's -- for
4  example, in the case in the Western District of Louisiana,
5  what the judge basically said was that he didn't need -- that
6  my -- whatever I had to say that contradicted the medical
7  opinion, I couldn't do that. And then he basically said that
8  for the other part of the accident, the reconstruction part
9  of the accident, he didn't need me.
10     Q.   Okay. Do you know which judge that was or which
11 matter that was?
12     A.   That was -- the judge was Judge Drell. And the
13 matter was Layssard versus USA.
14     Q.   Okay. What about the time that you were excluded
15 in Galveston County? What was the reason you were excluded,
16 as you understand it?
17     A.   I was simply excluded. I saw the order, but
18 basically I didn't get much to it. It just said I'm
19 excluded.
20     Q.   Okay. Do you recall the caption of that case?
21     A.   I believe it was Barnett versus Howard.
22     Q.   And you told me you've been excluded twice in
23 Harris County. Can you separate those two for me and tell me
24 on what basis you were excluded in either or both of those?
25     A.   I only recall one specific, and that was Ibarra

Page 10

1  versus Harris. And the basis for that was that I did not
2  have the specific weight of one of the vehicles.
3       Q.   Did you perform an accident reconstruction in the
4  case that is the subject of this litigation?
5       A.   Yes. Again, with limited accident reconstruction
6  in order to answer the question I'm being asked.
7       Q.   Okay. When were you retained in the matter that
8  we're here about today, Dr. Baratta?
9       A.   On July 25th of 2016.
10      Q.   And as you understood your retention, what were you
11 being retained to do?
12      A.   To analyze the dynamics of the accident and to look
13 at the motions and mechanisms that the occupants of the
14 smaller vehicle, of the Honda, would have undergone in the
15 accident.
16      Q.   Did you make any calculations as to occupant
17 kinematics for the people in the Honda?
18      A.   Not specific calculations, simply comparison
19 against normative data.
20      Q.   What is your rate that you're charging Mr. Clayman
21 or his client for your work in this matter?
22      A.   Rimkus charges my time at a rate of $350 per hour.
23      Q.   And do you know how much you have billed so far?
24      A.   I don't. It should be contained within the
25 records, but I've not reviewed it.

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 11

1   Q.   Okay.  That will be within what we're attaching as
2   Exhibit 1, your bill to date?
3   A.   Yes, sir.
4   Q.   Okay.  How does your trial testimony work?  Do you
5   bill by the hour?  Is it a flat fee?  Is there a minimum fee?
6   Can you explain that to me a little bit?
7   A.   Strictly by the hour.
8   Q.   Okay.  Do you count travel time in that?
9   A.   Yes.
10   Q.   Okay.  If you can, tell me a little bit about your
11   accident reconstruction, what you did to reconstruct this
12   accident, what methodology you used in doing so, please.
13   A.   Well, specifically the first part of the
14   methodology was to compare the photographs of the vehicles
15   to -- to look at the photographs of the vehicles and to look
16   at the configuration of the accident in the accident report,
17   then to examine the type of damage to the vehicles in
18   relation to published literature.  And that gave me one part
19   of the reconstruction, which is related to the first or the
20   sideswipe scenario.
21           The second methodology was I used engineering
22   principles, specifically failure analysis of the tabs within
23   the back of the Honda.  So, I looked at an exemplar Honda
24   and I measured the bumper tabs.  And then I looked at the
25   mechanical properties of polyurethane, which is the material

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 14

1  Q.  Will that video be contained in Exhibit 1 that
2  we're attaching, which is your file?
3  A.  Yes, sir.
4  Q.  Okay. Have you ever spoken to any of the people
5  involved in this accident in either vehicle?
6  A.  No, sir.
7  Q.  Okay. I saw in your report that you read a
8  transcribed statement from Mr. Paino. I may be
9  mispronouncing his name, but the gentleman who was driving
10 the Hino truck. Do you recall that?
11 A.  I don't recall it specifically. But if I listed it
12 on the basis, then I did.
13 Q.  Okay. And that transcript would be in Exhibit 1 as
14 well?
15 A.  Yes, sir.
16 Q.  Okay. Have you ever visited the accident scene
17 where this wreck occurred at any time after July 25th of
18 2016?
19 A.  No, sir.
20 Q.  Okay. In performing your reconstruction, did you
21 personally take any measurements?
22 A.  No, sir.
23 Q.  In performing your reconstruction, did you rely
24 upon any measurements taken by anyone else?
25 A.  No, sir.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 15

1   Q.   Have you ever inspected either of the vehicles
2   involved in the accident that is the subject of this
3   litigation?
4   A.   If you mean personally, no.
5   Q.   Okay. And just because you answered that way, let
6   me ask you, did you inspect them some other way?
7   A.   Well, viewing photographs and repair estimates are
8   essentially inspections by proxy. But I did not personally
9   inspect them.
10  Q.   Okay. All right. I already asked you about the
11  drivers, but I want to ask you this: Did you speak to any
12  witnesses that witnessed this accident that might be
13  different from the driver or passenger of my vehicle or the
14  driver of the truck?
15  A.   No, sir.
16  Q.   Did you perform any crash testing or reproduction
17  of this accident using software?
18  A.   No, sir.
19  Q.   I should have broken that into two questions. Did
20  you perform any crash testing in your analysis in this case?
21  A.   No, sir.
22  Q.   I think in prior times when you and I have spoken,
23  you certainly have that capability at Rimkus if you want to;
24  is that correct?
25  A.   Yes.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 16

1  Q.   Okay.  Is there a reason you did not perform any
2  crash testing in this case?
3  A.   Yes.  You mean by computer or -- I mean, there is
4  no -- we didn't do it physically because it was simply not
5  feasible.  We didn't do it by computer because the way that
6  the computer models work, they don't model snagging nor do
7  they model sideswipes very well.
8  Q.   As I read your report, the section marked
9  "Section II CONCLUSIONS" at Page 2 of your report, does that
10 adequately and accurately summarize the opinions you intend
11 to offer in this case?
12 A.   Yes, sir.
13 Q.   Okay.  Are there any opinions outside of the Nos. 1
14 through 5 on Page 2 under the title "CONCLUSIONS" that you
15 intend to offer in this case that I don't see on that page?
16 A.   Well, there's nothing that's not on the report.
17 And the point is that there are some other bits of
18 information that are contained elsewhere in the report.  But,
19 of course, understanding our venue, I would not have anything
20 that's not written in the report that I would be willing to
21 express in trial.
22 Q.   Okay.  I just want to make sure I've got the
23 universe of your opinions.  I see the five conclusions you've
24 reached.  Tell me where I can find any other opinions that
25 you intend to offer within the report because there's a lot

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 19

1 Q. Okay. If they were in the same accident and in the
2 same vehicle, why would they have experienced different
3 amounts of force?
4 A. The forces here are inertial forces, and they
5 undergo similar or basically the same accelerations. And the
6 mass of the person is what makes the difference in the force
7 in the lumbar spine.
8 Q. Okay. What type of force are you talking about
9 when you use the term "force"? Is there a certain loading
10 that you're talking about?
11 A. In this, I refer specifically here to compressor
12 forces.
13 Q. Right. What other types of forces -- and this goes
14 back to my question a few minutes ago -- would my clients
15 have experienced?
16 A. Oh. They would basically experience minor bending
17 moments and basically negligible shear.
18 Q. Would they have experienced, aside from shear,
19 torsion?
20 A. No.
21 Q. Sir?
22 A. No. I mean, not meaningful torsion. There's no
23 torsional component to the accident. So, although it's one
24 of those things that there may be coupling leading to
25 torsion, it would be negligible.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 20

1  Q.    Torsion would be created when the bumpers grabbed
2  on to one another and then when the Honda broke free from
3  that when the bumper dislodged; isn't that correct?
4  A.    No.
5  Q.    Okay.  Maybe we're talking over each other.  I just
6  couldn't hear a response.
7  A.    Oh.  It may be because I am hearing you very well
8  and you're not hearing me very well.  But the answer is, no,
9  there's no -- other than coupling, there would be no
10 torsional loads here.
11 Q.    All right.  Would there have been any other loads?
12 A.    There would be no other meaningful loads here.
13 Q.    Now, I'm not asking -- I don't want to characterize
14 meaningful or not meaningful right now.  Would there have
15 been any other loads?
16 A.    Well, there's always negligible shear loads.
17 There's always negligible torsional loads.  There's
18 negligible bending loads.  But basically -- are there loads?
19 Sure, but they're all negligible.
20 Q.    Would there have been flexion loads?
21 A.    No, sir.  Oh, there would be some minor flexion
22 component.  As the vehicle slows down a little bit, they will
23 tend to move forward.
24 Q.    Okay.  What about extension loads?
25 A.    No.

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

1    Q.    There would be none?

2    A.    None.

3    Q.    Do we agree that when they had MRIs, both my
4    clients had objective signs of issues within their spines
5    when they had MRIs?

6    A.    Yes, sir.

7    Q.    What is compressive force?  Describe to me how one
8    experiences compression in the spine.

9    A.    Well, compression is simply a force that tries to
10   make the spine shorter.  And what happens is that in --
11   number one, our spine is always under a compressive load.
12   And in the course, let's say, of an accident, there would be
13   some variation or some increase in the compressive load of
14   the spine as it sways from side to side or front to back.

15   Q.    All right.  Essentially compressive force is that
16   of compression of the spine in a downward motion; correct?

17   A.    Yes, basically making it shorter.  Most of the time
18   it's not a downward direction, but it can also be from the
19   bottom up.  Let's say if you were to fall, it's in an upward
20   direction from the bottom.

21   Q.    Yes, sir.  If Mr. Clayman stood and put his hands
22   on top of my head and pushed down on my head, I would
23   experience a compressive force; is that correct?

24   A.    Yes, above your native compressive load because of
25   the weight of your head and because of the muscles keeping

```
 1   your spine straight.
 2       Q.    Yes, sir.  If I sneeze real hard and whip my neck
 3   side to side in my sneezing, what type of forces would my
 4   spine take on then?
 5       A.    Well, most people in a sneeze, they don't move side
 6   to side but back to front.  And a sneeze for a person of --
 7   having seen you, you are fairly tall.  I would guess it would
 8   be somewhere in the range of 20-something pounds, maybe
 9   approaching 25, 26 pounds.
10       Q.    No, sir.  I'm asking what types of forces would be
11   exerted on my spine if I went side to side with my neck.
12       A.    Lateral bending.
13       Q.    Okay.  So, the force would be a lateral force?
14       A.    Yes.  It would be a lateral moment.  But, yes, it
15   would be lateral.
16       Q.    All right.  If I whipped my neck backwards and
17   forwards, what kind of forces are exerted on my spine?
18       A.    That's primarily flexion and extension.
19       Q.    Okay.  Did you calculate the amount of lateral
20   force that would have been exerted upon my clients' spines in
21   your work in this case?
22       A.    No, sir.
23       Q.    Did you calculate the amount of either flexion or
24   extension forces that would have been exerted on my clients'
25   spines in your work in this case?
```

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

1    A.    No, sir.

2    Q.    Tell me how you arrived at the Delta V that you

3 used in this case, please.

4    A.    I explained that before. I looked at the geometry

5 and mechanical properties of polyurethane because the bumper

6 covers are made out of polyurethane. And I don't know what

7 specific formulation of polyurethane. So, I assumed it was

8 the strongest polyurethane available, which has a tensile

9 strength of 9,000 psi. And then I just calculated how much

10 force it takes to make it fail.

11   Q.    Okay. Did the weight of the truck factor at all in

12 the opinions that you've offered in your report in this case?

13   A.    No, sir.

14   Q.    If Object A strikes Object B, do we agree that more

15 force is visited upon Object B if either Object A weighs more

16 and the weight increases or if its speed increases when they

17 collide? So, if Object A is one pound when it hits Object B,

18 there's a different amount of force than if Object A is ten

19 pounds when it hits Object B. Is that basically correct?

20   A.    Well, basically, yes. But once you have a

21 difference of about seven or eight to one or greater, then

22 that difference becomes much smaller. And, so, if you have

23 something very heavy making contact with something very

24 light, once that difference is above, let's say, ten to one,

25 it becomes -- that ratio becomes meaningless because of the

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 24

1  large discrepancy.
2      Q.   Do you have the capability of calculating the
3  occupant kinematics in any given wreck using the facilities
4  at Rimkus, the crash dummies and putting sensor devices in
5  those and recreating an accident?
6      A.   Not physically.
7      Q.   Explain that to me. I didn't understand what you
8  mean.
9      A.   Well, because -- when you said dummies and so on,
10 we don't have crash dummies laying around.
11     Q.   Okay. Does Rimkus have crash dummies? Do you-all
12 own those in your facility?
13     A.   No, not instrumented crash dummies, sir. No, we
14 don't.
15     Q.   Okay. Have you ever done any testing with
16 instrumented crash dummies?
17     A.   No, sir, other than those crash dummies being live;
18 but that's another story.
19     Q.   I understand.
20          Did you tell me that you got an exemplar Honda for
21 this case?
22     A.   We looked at a Honda Accord of about the same -- a
23 Honda Accord. We did look at one at a parking lot.
24     Q.   Okay. When you say "we looked at one," where did
25 you go and what car did you look at?

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Richard V. Baratta, PH.D., P.E.
Esaw Wright, et al v. Selective Insurance, et al

Page 25

1  A. It was a Honda Accord, and it was in the parking
2  garage of my work.
3  Q. Okay. Whose Accord was it, I guess?
4  A. I don't know.
5  Q. So, you walked around in the parking garage at work
6  and found a Honda Accord?
7  A. Yes.
8  Q. Okay. And when you looked at it, what did you do
9  to make it applicable to this case? Did you feel it, touch
10 it, take pictures of it? I'm just trying to understand your
11 earlier testimony about an exemplar Honda and what you did
12 with it.
13 A. Most importantly, my interest was the mounting tabs
14 for the bumpers. And, so, what we did was looked at the
15 bumper mounting tabs underneath and tape measures of the
16 thickness and the size of the tabs themselves.
17 Q. So, you got under somebody's Honda Accord in your
18 parking garage at work and examined it?
19 A. Yes.
20 Q. And you don't know whose Accord this was?
21 A. Correct.
22 Q. Do you know the model year of the Accord that you
23 inspected?
24 A. Not as I sit here.
25 Q. Okay. Did you take any photographs of that Honda